UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JUSTIN BLOT,

                            Plaintiff,

v.                                                          1:14-CV-0991
                                                            (GTS/CFH)
TOWN OF COLONIE; TOWN OF COLONIE
POLICE DEP'T; POLICE CHIEF STEVEN HEIDER;
SERGEANT GULLINESE; UNKNOWN
SUPERVISORY OFFICERS; UNKNOWN POLICE
OFFICERS; POLICE OFFICER CALABRESE; and
POLICE OFFICER TREMBLAY,

                            Defendants.
_____

APPEARANCES:                                                OF COUNSEL:

LAW OFFICE OF JACK ANGELOU                                  JACK D. ANGELOU, ESQ.
  Counsel for Plaintiff
145 Willis Avenue, 2nd Floor
Mineola, NY 11501

MAYNARD, O'CONNOR, SMITH &                                  EDWIN J. TOBIN, JR., ESQ.
CATALINOTTO LLP
  Counsel for Defendants
6 Tower Place
Albany, NY 12203

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this civil rights action filed by Justin Blot ("Plaintiff")

against the Town of Colonie, Town of Colonie Police Department, Police Chief Steven Heider,

Sergeant Guillinese, Police Officer Calabrese, Police Officer Tremblay, unknown supervisory

officers and unknown police officers ("Defendants"), is Defendants' motion for summary

judgment.  (Dkt. No. 98.)  For the reasons set forth below, Defendants' motion is granted in part

and denied in part, and all of Plaintiff's claims are dismissed except for his excessive force claim under the Fourth Amendment against Defendants Tremblay and Calabrese.

## I.     RELEVANT BACKGROUND

### A.     Plaintiff's Claims

Generally, in his Amended Complaint, Plaintiff alleges that, on September 13, 2013, at his parents' home in the Town of Colonie, New York, Colonie Police Officers twice Tasered him, applied excessively tight handcuffs to him and took him against his will to Ellis Hospital, injuring his arms, wrists and hands, and causing him pain and mental anguish.  (*Id.*)  Plaintiff alleges that the Police Officers took these actions despite knowing that he had back and neck problems, that he posed no threat of harm to himself or others, and that there was no probable cause to arrest him, as demonstrated by the fact that they never subsequently lodged criminal charges against him.  (*Id.*)  Finally, Plaintiff alleges that the Police Department never launched an internal investigation of the matter despite the fact that Plaintiff attempted to lodge a formal complaint regarding it.  (*Id.*)

Generally, based on these factual allegations, Plaintiff asserts the following 20 claims against Defendants: (1) a claim of false arrest under the Fourth Amendment; (2) a claim of malicious prosecution under the Fourth and Fourteenth Amendments; (3) a claim of conspiracy under 42 U.S.C. § 1983; (4) a claim of supervisory liability against Defendants Guillenese and Heider under 42 U.S.C. § 1983; (5) a monetary claim of municipal liability against Defendant Town of Colonie for unconstitutional customs, policies and practices under 42 U.S.C. § 1983; (6) a monetary claim of municipal liability for negligent failure to train and supervise under 42 U.S.C. § 1983; (7) a claim of negligent failure to train and supervise against Defendant Town of

Colonie under New York State law; (8) a claim of negligent infliction of emotional distress under New York State law; (9) a claim of negligent infliction of personal injuries under "state and federal" law; (10) a claim of violation of his rights under the "state and federal" Americans with Disabilities Act; (11) a claim of excessive force under the Fourth Amendment (and unreasonable search of Plaintiff's person under the Fourth Amendment); (12) a claim of malicious prosecution under New York State law; (13) a claim of abuse of process under New York State law; (14) a claim of intentional infliction of emotional distress under New York State law; (15) a claim of battery under New York State law; (16) a claim of assault under New York State law; (17) a claim of municipal liability against Defendant Town of Colonie and the Police Department of the Town of Colonie under New York State law; (18) a claim of negligence under New York State law; (19) a claim of "constitutional violations"; and (20) a claim of "violation of police procedures regarding stun guns." (*Id.*)

**B.    Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts ("Rule 7.1 Statement") and expressly admitted by Plaintiff in his response thereto ("Rule 7.1 Response"). (*Compare* Dkt. No. 98, Attach. 22 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 100, Attach. 18 [Plf.'s Rule 7.1 Response].)

1.     This action pertains to an incident that occurred on September 13, 2013, at the house of Plaintiff's parents (at 36 Hampshire Road, Colonie, New York), as recorded in the Colonie Police incident report regarding the use of force and Colonie Police incident report regarding an emotionally disturbed person.

<u>Events Before Arrival of Police</u>

2.        On September 13, 2013, at approximately 9:45 p.m., a Town of Colonie

dispatcher received a telephone call communicating what the dispatcher reported as the

following facts: "34 [year-old] son flipping out upstairs[.] There are firearms inside the house[.]

They are going to secure the weapons[.] Son has been having problems at home[.] Is visiting

parents[.] Son has depression[.] No [intoxication.] Husband and older son is upstairs with

younger [son.] They are trying to keep him calm[.] No fighting at this time. Daughter is an

offduty [Sergeant in the New York Police Department.] Caller is outside now[.] Father has the

weapons[.]" At approximately 9:58 p.m., the dispatcher changed the call type to "Psychiatric /

Abnormal Behavior / Suicide Attempt," and reported the following facts: "1. He is violent. 2. He

does not have a weapon. 3. The patient is inside the same structure. 4. It's not known if there is

an attempted suicide. 5. He is completely alert (responding appropriately)."[1]

3.        In Plaintiff's bedroom at the time were two pistols owned by him, including a .44

special pistol which he purported to carry for personal protection.[2]

---

[1]        In her deposition, Plaintiff's mother Karen Blot, who believes that she was the
911 caller identified in the police records, testified that she does not recall "saying something
along the lines of [her] son . . . , quote, flipping out upstairs." (Dkt. No. 100, Attach. 1, at 33
[attaching page "32" of Karen Blot's Depo. Tr.].) She further testified that she did not tell the
911 dispatcher that she had concerns for his mental health, that he was "violent," or that it was
unknown whether he had attempted suicide. (*Id*. at 33-34 [attaching pages "32" and "33" of
Karen Blot's Depo. Tr.].)

[2]        (Dkt. No. 98, Attach. 15, at 97-99 [attaching pages "96" through "98" of Plf.'s
EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 3 [Plf.'s Rule 7.1 Response, failing to specifically deny,
with a supporting record citation, that one of the firearms was a .44 special pistol that he
purported to carry for personal protection].) The Court notes that, although Plaintiff asserts that
the pistols were lying on a dresser and bed in the bedroom, he attempts to support that assertion
with record citations that do not actually support the assertion. (Dkt. No. 100, Attach. 18, at ¶ 3
[Plf.'s Rule 7.1 Response].) Moreover, he cites an affidavit that post-dates his contrary
deposition testimony, which is prohibited. *See Trans-Orient Marine Corp. v. Star Trading &
Marine, Inc.*, 925 F.2d 566, 572 (2d Cir.1991) ("It is well-settled that a party may not defeat . . .

4

4.	These pistols were not locked with trigger locks. In addition, Plaintiff had ammunition with him.

5.	Plaintiff, who had just gotten out of the shower, was arguing with his father, who had come upstairs.  His father called for Plaintiff's older brother, Jason Blot, who came running upstairs aggressively and stood in a doorway.  Plaintiff said to his brother, "Jay, don't touch me. I don't want to fight with you. Stay back." Jason stayed back.[3]

Events After Arrival of Police

6.	The police having been called (and having arrived), Plaintiff explained to them that his wife had post-partum depression and that there had been a lot going on: he thought his cancer was back, his daughter had spina bifida, and he was very stressed and going through a lot right now.

7.	The initial officer to arrive at his parents' house was Calabrese who talked to Plaintiff for about five minutes before two other officers responded in back up.

8.	At the time he spoke to the police, Plaintiff was outside his parents' house wearing only a towel (again, having just gotten out of the shower).  His brother Jason came

---

a motion [for summary judgment] by submitting an affidavit that disputes [or contradicts] his prior sworn testimony."), *accord, Langman Fabrics v. Graf Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir.1998); *Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A]n affidavit . . . that, by omission or addition, contradicts the affiant's previous deposition testimony' is insufficient to create a genuine issue of fact."); *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (noting that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment).

[3]	(Dkt. No. 98, Attach. 15, at 105, 108-09, 113 [attaching pages "104," "107," "108" and "112" of Plf.'s EBT Tr.].)  In his deposition, Plaintiff's brother Jason Blot testified that, when he first walked into Plaintiff's bedroom at this time, he believes he saw one gun lying on the bed and another gun on the dresser (neither of which was loaded), and he took them out of the room, brought them downstairs and put them in his father's dresser drawer.  (Dkt. No. 98, Attach. 17, at 23 [attaching page "22" of Jason Blot's Depo. Tr.].)

outside and started arguing with him in front of the police.[4]

9.      Plaintiff acknowledges that things escalated when his brother came out to the front porch, his brother raised his voice, Plaintiff yelled at his brother, and Plaintiff and his father yelled at each other.[5]

10.     Plaintiff was concerned that his brother Jason was going to fight with him.[6]

11.     The two had a history of physical confrontations with each other.[7]

12.     Plaintiff took a flag off the wall of the house and brought it down to the front yard and threw it on the ground.  A couple of times, he grabbed his towel, which was starting fall, and

---

[4]      (Dkt. No. 98, Attach. 15, at 109 [attaching page "108" of Plf.'s EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 7 [Plf.'s Rule 7.1 Response, failing to specifically deny, with a supporting record citation, that Plaintiff argued with his brother Jason in front of the police].)

[5]      (Dkt. No. 98, Attach. 15, at 194-95 [attaching pages "193" and "194" of Plf.'s EBT Tr.].)

[6]      (Dkt. No. 98, Attach. 15, at 113 [attaching page "112" of Plf.'s EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 8 [Plf.'s Rule 7.1 Response, failing to specifically deny, with a supporting record citation, that he was concerned that Jason was going to fight with him].)

[7]      Although Plaintiff attempts to add that "the record does not reflect that this [fact] was known to the responding police officers," the fact asserted does not state that the responding police officers had such knowledge. While Plaintiff might believe such knowledge was implied by Defendants' factual assertion, denials of such perceived implications are insufficient to create a genuine dispute of material fact for trial, under Local Rule 7.1.  *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").  To the extent that Plaintiff desired to set forth any additional material facts that he contends are in dispute, he was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.

pulled it back up; at some point, his towel may have fallen off.[8]

13.    Plaintiff was raising his voice and yelling.

14.    The Town of Colonie Incident Report for an emotionally disturbed person states as follows, in pertinent part: that Plaintiff's brother Jason Blot told that police that, apart from having problems at home after the recent birth of his child, Plaintiff had been talking about God talking through him; that Jason also told the police that Plaintiff was becoming increasingly paranoid that someone was out to get him; and that, upon the police officers' arrival, Plaintiff was outside wearing only a towel, was becoming increasingly agitated, and stated that he wanted to show the police department his grave, that he wanted to die, and that he wanted the police department to achieve this.[9]

15.    Plaintiff acknowledges that, at the time, "[he was] stressed[;] [he was] dealing with a lot of shit."

16.    Plaintiff told a police officer that he was concerned that his father and brother were trying to put their hands on him, and that he was worried that they were going to fight with him.

---

[8]    (Dkt. No. 98, Attach. 15, at 117-18 [attaching pages "116" and "117" of Plf.'s EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 10 [Plf.'s Rule 7.1 Response, failing to specifically deny, with a supporting record citation, that he took a flag off the wall of the house and brought it down to the front yard and threw it on the ground].)

[9]    (Dkt. No. 98, Attach. 8 [Incident Report].)  Plaintiff's focus on whether Jason and/or Plaintiff actually made these statements to the police officers is misplaced, because the fact asserted by Defendants merely describes what the Incident Report stated.  While Plaintiff might believe that the truth of those statements was implied by Defendants' factual assertion, again, denials of such perceived implications are insufficient to create a genuine dispute of material fact for trial, under Local Rule 7.1.  *See, supra,* note 5 of this Decision and Order.  To the extent that Plaintiff desired to set forth any additional material facts that he contends are in dispute, he was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.  Finally, the Court notes that, in any event, Plaintiff's Rule 7.1 Response fails to specifically deny, with a supporting record citation, that, upon the police officers' arrival, Plaintiff was outside wearing a towel and becoming increasingly agitated.  (Dkt. No. 100, Attach. 18, at ¶ 10 [Plf.'s Rule 7.1 Response].)

17. Plaintiff's father, Berry Blot, was on the front porch with him. As his father opened the door as if going in the house and stopped, Plaintiff accidentally bumped into him. Plaintiff put his hands up and said, "Dad, I didn't mean to touch you." Sometime later, Plaintiff yelled, "Fuck you, Dad," whereupon his father got mad and pushed him over a rocking bench on the front porch.[10]

18. According to Berry Blot, after he pushed Plaintiff, who fell over the bench, Berry held Plaintiff down (and Plaintiff's brother Jason Blot stepped in to hold Plaintiff down), because Berry did not want Plaintiff to go back into the house and he did not want the situation to continue to escalate.[11]

19. According to Berry Blot, the reason Plaintiff tried to push past Berry was so that Plaintiff could get back into the house.[12]

20. This was why Berry Blot pushed Plaintiff: to keep him from entering the house. Immediately after that, Jason jumped on top of Plaintiff to hold him down.

21. According to Berry Blot, a police officer watching physical contact between father and son might be reasonably concerned that it was going to explode into a fairly volatile situation instantaneously.[13]

First Deployment of Taser

---

[10]     (Dkt. No. 98, Attach. 15, at 146-47 [attaching pages "145" and "146" of Plf.'s EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 19 [Plf.'s Rule 7.1 Response].)

[11]     (Dkt. No. 98, Attach. 16, at 54-55 [attaching pages "53" and "54" of Berry Blot's Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 30 [Plf.'s Rule 7.1 Response].)

[12]     (Dkt. No. 98, Attach. 16, at 57-58 [attaching pages "56" and "57" of Berry Blot's Depo. Tr.].)

[13]     (Dkt. No. 98, Attach. 16, at 53-54 [attaching pages "52" and "53" of Berry Blot's Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 30 [Plf.'s Rule 7.1 Response].)

22. Plaintiff claims that, as he was trying to get up, his brother came toward him and "like jumped on" him. The next thing Plaintiff heard was "Move" and "Don't shoot" and Plaintiff was shot with a Taser.[14]

23. When his brother "like jumped on him," Plaintiff did not know if his brother was going to stay on top of him.[15]

24. After Plaintiff "got shoved down" by his father, Plaintiff's brother Jason wanted to "restrain him" to protect both him and his father, because he did not want the two to go at it.[16]

25. So Jason got on top of Plaintiff and put all of his weight on top of Plaintiff, "trying to keep him down."

26. The officers yelled for Jason to let Plaintiff go.

27. At some point after Jason let Plaintiff go, Plaintiff was shot with the Taser.[17]

28. His brother got out of the way on a command to "move" and then Plaintiff was Tasered.[18]

29. According to Berry Blot, Officer Tremblay drew his Taser, somebody yelled,

---

[14] (Dkt. No. 98, Attach. 15, at 150-52 [attaching pages "149" through "151" of Plf.'s EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 20 [Plf.'s Rule 7.1 Response].)

[15] (Dkt. No. 98, Attach. 15, at 150-52 [attaching pages "149" through "151" of Plf.'s EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 21 [Plf.'s Rule 7.1 Response].)

[16] (Dkt. No. 98, Attach. 17, at 48-50 [attaching pages "45" through "47" of Jason Blot's Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 23 [Plf.'s Rule 7.1 Response].)

[17] Plaintiff testified that he was Tasered while trying to get up, while Plaintiff's brother Jason testified that Plaintiff was Tasered after he got up and went around Jason. (*Compare* Dkt. No. 98, Attach. 15, at 150 [attaching page "149" of Plf.'s EBT Tr.] *with* Dkt. No. 98, Attach. 17, at 52 [attaching page "49" of Jason Blot's Depo. Tr.].)

[18] (Dkt. No. 98, Attach. 15, at 150-52 [attaching pages "149" through "151" of Plf.'s EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 22 [Plf.'s Rule 7.1 Response].)

"Taser, move out of the way," and Officer Tremblay shot Plaintiff with the Taser.[19]

30.    Berry Blot witnessed that the Taser had the effect of incapacitating Plaintiff and that the police officers then seized the opportunity to go in grab Plaintiff.

31.    Jason Blot then pushed his father Berry Blot into the house. Berry came back out 15 to 30 seconds later and he saw that the officers were still in the process of putting handcuffs on Plaintiff, it eventually taking them one or two minutes to do so.[20]

<u>Second Deployment of Taser</u>

32.    Plaintiff acknowledges that (at some point before the first deployment of the Taser) Officer Calabrese told him to "[c]alm down," and that (after the first deployment of the Taser) the police officers told him to "[s]top resisting."[21]

33.    A former New York City Police Officer with military police qualifications, Plaintiff knew that, if a suspect resists a police officer's efforts to secure him, the police officer may need to employ force to do so, and the level of force may depend upon the level of resistance.[22]

34.    According to Plaintiff, between the first Taser deployment and second Taser deployment (17 seconds later), the police said, "Stop resisting," even though they were not

_____

[19]    (Dkt. No. 98, Attach. 16, at 59 [attaching page "58" of Berry Blot's Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 34 [Plf.'s Rule 7.1 Response].)

[20]    (Dkt. No. 98, Attach. 16, at 76-77, 79 [attaching pages "75," "76" and "78" of Berry Blot's Depo. Tr.].)

[21]    (Dkt. No. 98, Attach. 15, at 150-52 [attaching pages "161," "162," "190" and "191" of Plf.'s EBT Tr.].)

[22]    (Dkt. No. 98, Attach. 15, at 67, 81, 93 [attaching pages "66," "80" and "92" of Plf.'s EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 29 [Plf.'s Rule 7.1 Response].)

touching him and he was lying on the ground, not moving.[23]

35.     According to the Use of Force Forms of Officers Tremblay, Calabrese and
Cronin, Officer Tremblay first deployed the Taser; then Officer Cronin guided Plaintiff to the
ground, where Plaintiff resisted officers' efforts to handcuff him; then Officer Calabrese picked
up the Taser and deployed the Taser a second time.  Officer Cronin had no involvement in any
Taser deployment, and was involved only in the efforts to handcuff Plaintiff.[24]

## Subsequent Mental Health Care

36.     The Emergency Medical Services ("EMS") Prehospital Care Report stated as
follows, in pertinent part, regarding Plaintiff: "wrestling [with the police department]. [The

---

[23]     (Dkt. No. 98, Attach. 15, at 161-63 [attaching pages "160" through "162" of Plf.'s
EBT Tr.]; Dkt. No. 100, Attach. 18, at ¶ 28 [Plf.'s Rule 7.1 Response].)  In his deposition,
Defendant Gullinese testified that he found no inappropriate conduct by the officers at the scene
and that, if he had been at the scene, he would not have done anything differently.  (Dkt. No.
100, Attach. 2, at 65 [attaching page "65" of Def. Gullinese's Depo. Tr.].)  However, in his
deposition, Plaintiff's father Berry Blot testified that, approximately two weeks after the
incident, Defendant Gullinese stated to him, "Mr. Blot, had I been there, hopefully that would
have been a different outcome. But I wasn't there, and I wasn't there to stop the officers from
using [the Taser]."  (Dkt. No. 98, Attach. 16, at 65 [attaching page "64" of Berry Blot's Depo.
Tr.].)

[24]     (Dkt. No. 98, Attach. 13-15 [Use of Force Forms]; Dkt. No. 100, Attach. 18, at ¶
44 [Plf.'s Rule 7.1 Response, failing to specifically controvert any factual assertion other than
that Plaintiff was resisting after the first Taser deployment].)  With regard to Plaintiff's challenge
to the accuracy of the Use of Force Forms' statement that Plaintiff was resisting after the first
Taser deployment, that challenge is improper, because the fact asserted by Defendants merely
describes what the Use of Force Forms stated.  While Plaintiff might believe that the accuracy of
the referenced statement was implied by Defendants' factual assertion, again, denials of such
perceived implications are insufficient to create a genuine dispute of material fact for trial, under
Local Rule 7.1.  *See, supra,* note 5 of this Decision and Order.  To the extent that Plaintiff
desired to set forth any additional material facts that he contends are in dispute, he was required
by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.  The Court notes that, in his
deposition, Plaintiff's father testified that, immediately after he was Tasered the first time,
Plaintiff rolled off the glider and hit the concrete, his head thudding against the concrete.  (Dkt.
No. 98, Attach. 16, at 74-75 [attaching pages "73" and "74" of Berry Blot's Depo. Tr.].)

patient] had been Tasered [two times with no] effect. [The patient] continued to fight [with the police department] and EMS. [The patient] was administered 5 mg [of] Versed [intramuscularly]. Following [that] administration, [the patient] continued to be verbally abusive[,] however was able to be handcuffed and secured to a backboard."[25]

37.     According to the Interdisciplinary Admission Assessment from the Department of Psychiatry at Ellis Hospital, Plaintiff's parents reported as follows, in pertinent part: that he has been increasingly paranoid; that he had two guns which his father took away for fear due to patient seeming like he was going to "snap"; that he has been preoccupied and rambling talking about God and calling several people he has not spoken to in years; that he is very erratic and they feel he is psychotic and needs psychiatric admission; and that they feel he is a danger to others and self and psychotic.[26]

_____

[25]     (Dkt. No. 98, Attach. 11, at 1 [Prehospital Care Report]; Dkt. No. 100, Attach. 18, at ¶ 37 [Plf.'s Rule 7.1 Response, failing to specifically controvert any factual assertion other than that "[the patient] had been tazed [two times with no] effect"].)  With regard to Plaintiff challenge to the accuracy of the report's statement that the patient had been Tasered two times with no effect, that challenge is improper, because the fact asserted by Defendants merely describes what the report stated.  While Plaintiff might believe that the accuracy of the referenced statement was implied by Defendants' factual assertion, again, denials of such perceived implications are insufficient to create a genuine dispute of material fact for trial, under Local Rule 7.1.  *See, supra,* note 5 of this Decision and Order.  To the extent that Plaintiff desired to set forth any additional material facts that he contends are in dispute, he was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs.  The Court notes that, in their depositions, Plaintiff, his father Berry Blot and/or his brother Jason Blot testified that Plaintiff was not "wrestling" with the police department, did not "fight" with the police department or EMS personnel, and was not "verbally abusive" the police department or EMS personnel.  (Dkt. No. 98, Attach. 15, at 163-64, 166-67 [attaching pages "162," "163," "165" and "166" of Plf.'s EBT Tr.]; Dkt. No. 98, Attach. 16, at 79-81 [attaching pages "78" through "80" of Berry Blot's Depo. Tr.]; Dkt. No. 98, Attach. 17, at 72-76, 79 [attaching pages "69" through "73" and "76" of Jason Blot's Depo. Tr.].)

[26]     (Dkt. No. 98, Attach. 19, at 84 [Plf.'s Medical Records].)  Plaintiff's focus on whether his parents actually made these statements and/or whether facts stated were true is misplaced, because the fact asserted by Defendants merely describes what the Admission Assessment stated.  While Plaintiff might believe that the truth of those statements was implied by Defendants' factual assertion, again, denials of such perceived implications are insufficient to

38.     According to records of Plaintiff's nine-day involuntary mental health admission at Ellis Hospital, Plaintiff was admitted and treated for an "acute psychotic break," worsening "rages," "paranoi[a]," "bipolar, mani[a]," having "no insight into his illness," and being a danger to himself or others.[27]

39.     Plaintiff's admission was a non-voluntary.

### Nature of Plaintiff's Complaint

40.     Plaintiff understood that he was handcuffed as part of standard procedure to take him to the hospital and that he was never arrested, although he would have preferred to have been arrested for harassment for arguing with his father (a violation).

41.     Plaintiff also acknowledged that "[m]aybe" he could have been arrested for disorderly conduct.[28]

---

create a genuine dispute of material fact for trial, under Local Rule 7.1. *See, supra,* note 5 of this Decision and Order. To the extent that Plaintiff desired to set forth any additional material facts that he contends are in dispute, he was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs. The Court notes that, in their depositions, Plaintiff's father Berry Blot and mother Karen Blot testified that they never told the Ellis Hospital Department of Psychiatry that Plaintiff was "paranoid," "psychotic," or a "danger" to others and himself. (Dkt. No. 98, Attach. 16, at 38-43 [attaching pages "37" through "42" of Berry Blot's Depo. Tr.]; Dkt. No. 100, Attach. 1, at 22, 26, 27 [attaching pages "21," "25" and "26" of Karen Blot's Depo. Tr.].) However, Plaintiff's assertion (in his statement of additional material facts in dispute) that Berry Blot was not concerned about Plaintiff's mental status (when the 911 call was made) is not supported by the record citation provided. (Dkt. No. 100, Attach. 18, at ¶ 82.)

[27]     (*See, e.g.*, Dkt. No. 98, Attach. 19, at 11, 33-34, 38, 49-50, 54, 57-59, 75, 85, 90-91, 93 [Plf.'s Medical Records]; Dkt. No. 100, Attach. 18, at ¶ 15 [Plf.'s Rule 7.1 Response, failing to cite record evidence in support of his denial].) While Plaintiff appears to challenge the materiality of the above-asserted fact (i.e., that it resulted not from his pre-arrest mental state but from the fact of his arrest), such a challenge of an implication of a fact is ineffective for the reasons stated above in note 5 of this Decision and Order. Moreover, a challenge to the materiality of a fact is appropriately leveled in an opposition memorandum of law and/or statement of additional material facts that he contends are in dispute, in accordance with Local Rule 7.1(a)(3).

[28]     (Dkt. No. 98, Attach. 15, at 196 [attaching pages "195" of Plf.'s EBT Tr.].)

42.     Plaintiff also felt that his father could have been charged with assault but he would not have pressed any charges against his father. Also he did not want a domestic incident report filed against his father.

43.     Plaintiff's complaints regarding what the Colonie Police did were that he was wrongfully Tasered and that he was wrongfully brought to Ellis Hospital. The sum of his complaint is that it was not necessary for him to be Tasered.[29]

## Testimony of Plaintiff's Police Expert

44.     According to Plaintiff's police procedure expert Matthew Steihm, "based on the totality of circumstances, there was probably enough [cause for the officers] to take [Plaintiff] in for an evaluation."[30]

45.     According to Plaintiff's expert, if Plaintiff was attempting to fight with either his father or his brother, "potentially [the officers] could tackle [Plaintiff]."[31]

46.     Other than an apparent conflict between the Town of Colonie's Taser training and its use-of-force policy documents (which issue he felt to be outside the scope of his review), Plaintiff's expert found none of the policies or procedures of the Town of Colonie to be inappropriate.[32]

---

[29]     The Court notes that, in his deposition, Defendant Tremblay testified that "there was no investigation in this case at all." (Dkt. No. 100, Attach. 4, at 88 [attaching page "88" of Def. Tremblay Depo. Tr.].) However, the record contains a document that reports, *inter alia*, the "Results of [an] Inv[estigation]." (Dkt. No. 100, Attach. 5, at 3-5.)

[30]     (Dkt. No. 98, Attach. 18, at 51-52 [attaching pages "50" and "51" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 46 [Plf.'s Rule 7.1 Response].)

[31]     (Dkt. No. 98, Attach. 18, at 52 [attaching page "51" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 47 [Plf.'s Rule 7.1 Response].)

[32]     (Dkt. No. 98, Attach. 18, at 58-59 [attaching pages "57" and "58" of Stiehm Depo. Tr.].)

47.　　In his report Plaintiff's expert found no improper training of any of the officers involved in this matter.[33]

48.　　Although Plaintiff's expert knew there was a peer review of the matter, in his report he did not note or find any deficiencies in that review because he did not look into the issue, which "wasn't germane to the case that was before [him]."[34]

49.　　In his report Plaintiff's expert did not find that Plaintiff being Tasered for eight seconds versus five seconds (in the first deployment of the Taser) was contrary to appropriate practice or protocol.[35]

50.　　In his report Plaintiff's expert did not find that a sergeant should have been called to the scene, that Plaintiff should have been photographed, or that the Taser darts should have been photographed or preserved.[36]

51.　　According to Plaintiff's expert, it would be absolutely reasonable for the responding officers to interpret the data they knew "on the way there" as constituting a situation that could rapidly evolve; and a police officer would need to exercise judgment and discretion on how to approach, and deal with, a person who was reported as "flipping out," "psychiatric," "[exhibiting] abnormal behavior," "[possibly presenting a] suicide attempt," and "violent."[37]

---

[33]　　(Dkt. No. 98, Attach. 18, at 59 [attaching page "58" of Stiehm Depo. Tr.].)

[34]　　(Dkt. No. 98, Attach. 18, at 59-60 [attaching pages "58" and "59" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 50 [Plf.'s Rule 7.1 Response].)

[35]　　(Dkt. No. 98, Attach. 18, at 60 [attaching page "59" of Stiehm Depo. Tr.].)

[36]　　(Dkt. No. 98, Attach. 18, at 61 [attaching page "60" of Stiehm Depo. Tr.].)

[37]　　(Dkt. No. 98, Attach. 18, at 69, 86 [attaching pages "68" and "85" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 53 [Plf.'s Rule 7.1 Response, failing to specifically controvert the second sentence presented above].)

52.     According to Plaintiff's expert, the record indicated aggressive or passive-aggressive behavior by Plaintiff; it also indicated statements by him to the police officers that he wanted to die and that he wanted them to help achieve this, which would potentially send a signal to them that any efforts to physically intervene with him could trigger behaviors on his part consistent with those statements.[38]

53.     According to Plaintiff's expert, the scenario was potentially volatile, and the last thing that a police officer would want to do with regard to a suspect who is described as psychiatric, violent, aggressive, paranoid and potentially suicidal would be to aggravate or provoke the suspect, if that could be avoided.[39]

54.     In his report Plaintiff's expert expresses no criticism that Plaintiff needed an involuntary mental health evaluation, acknowledging that Plaintiff was admitted involuntarily to Ellis Hospital for nine days after the occurrence; he further acknowledged that the officers were authorized to try to "secure" Plaintiff, who could potentially be perceived as an assault risk at the time of his encounter with the Colonie police.[40]

55.     Plaintiff's expert acknowledged that it would be contrary to accepted police practice for the police to leave the scene with Plaintiff in such a state of affairs.

---

[38]     (Dkt. No. 98, Attach. 18, at 90-92 [attaching pages "89," "90" and "91" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 44 [Plf.'s Rule 7.1 Response, failing to specifically controvert the factual assertion regarding aggressive or passive-aggressive behavior].)

[39]     (Dkt. No. 98, Attach. 18, at 92-93 [attaching pages "91" and "92" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 55 [Plf.'s Rule 7.1 Response, denying only that the scenario was "volatile," as opposed to "potentially volatile"].)

[40]     (Dkt. No. 98, Attach. 18, at 51, 95, 108 [attaching pages "50," "94" and "107" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 56 [Plf.'s Rule 7.1 Response, denying only that Plaintiff "was a potential assault risk," and asserting that he could "potentially be perceived as an assault risk"].)

56. Plaintiff's expert acknowledged that force was used against Plaintiff so that he could be secured, handcuffed and transported to Ellis Hospital for a mental health evaluation.

57. Plaintiff's expert acknowledged that the EMS records stated that Plaintiff was Tasered twice with no affect, that he continued to fight the police department, and that the EMS had to administer 5 mg of Versed, a sedative; Plaintiff's expert had no basis to challenge the EMS personnel's reasons for administering the sedative to Plaintiff.[41]

58. Plaintiff's expert acknowledged that, at the time of his emergency admission to Ellis Hospital, Plaintiff's diagnosis was manic and psychotic; he also acknowledged that an officer would have to use his judgment and his discretion at the scene to assess what he feels the subject's mental health capacities are or are not and how to respond.[42]

59. Plaintiff's expert believed that the record stated that, during the course of his mental health admission at Ellis Hospital, Plaintiff was assessed as an assault risk.[43]

60. Plaintiff's expert acknowledged that, according to the record, Plaintiff had stated to the police that he did not want to go to the hospital when he was at the scene; Plaintiff's expert further acknowledged that, based on that Plaintiff's statement, the officers could reasonably expect that they may encounter physical resistance from Plaintiff if they tried to secure him to take him to the hospital.[44]

---

[41] (Dkt. No. 98, Attach. 18, at 100-01, 104-05 [attaching pages "99," "100," "103" and "104" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 59 [Plf.'s Rule 7.1 Response, failing to specifically controvert the second sentence presented above].)

[42] (Dkt. No. 98, Attach. 18, at 106 [attaching page "105" of Stiehm Depo. Tr.].)

[43] (Dkt. No. 98, Attach. 18, at 108 [attaching page "107" of Stiehm Depo. Tr.].)

[44] (Dkt. No. 98, Attach. 18, at 109-11 [attaching pages "108" through "110" of Stiehm Depo. Tr.].)

61.     Plaintiff's expert acknowledged that the EMS report stated that Plaintiff "continued to fight with the police," and he acknowledged that those words did not describe passive resistance; however, Plaintiff's expert "would challenge [the EMS personnel's] review of the situation," and specifically their definition of "fight."[45]

62.     Plaintiff's expert acknowledged that, according to the testimony of Berry Blot, Plaintiff was "engaged" with Berry Blot and Jason Blot just before the Taser was deployed, with Berry having reasonable concerns that the situation was going to explode into a fairly volatile situation but hoping to prevent the physical contact from escalating.[46]

63.     Plaintiff's expert acknowledged that, if the Colonie Police Officers knew that Plaintiff was a former New York City Police Officer, they would potentially have reason to believe that, as a former New York City Police Officer, Plaintiff would be trained on how to overcome hand combat techniques that were employed upon him; Plaintiff's expert further acknowledged that this potential reasonable belief could be a consideration of the police officers in deciding whether they should go in "hands on" with Plaintiff.[47]

64.     Other potential considerations of the police officers (in deciding whether they should go in "hands on" with Plaintiff) would be (1) whether he was in a highly agitated combative and/or violent state by which he may engage the officers in maneuvers to overcome hand combat techniques that were employed upon him, and (2) whether the officers perceived

---

[45]     (Dkt. No. 98, Attach. 18, at 109 [attaching page "108" of Stiehm Depo. Tr.].)

[46]     (Dkt. No. 98, Attach. 18, at 113-14 [attaching pages "112" and "113" of Stiehm Depo. Tr.].)

[47]     (Dkt. No. 98, Attach. 18, at 115-16 [attaching pages "114" and "115" of Stiehm Depo. Tr.].)

Plaintiff as sizing them up and/or posturing for hand-to-hand combat.[48]

65.     Plaintiff's expert acknowledged that, at the time that Plaintiff said "fuck you" to his father and his father responded by immediately pushing Plaintiff over the bench, there would potentially be a legitimate police concern that the two individuals may get into a combative situation, which could explode in a split second causing someone to sustain physical injury, the level of which would be unknown.[49]

66.     If (as Jason Blot testified) Plaintiff did not stay down at the glider after being pushed down by his father and got back up and started to maneuver around Jason Blot toward his father, and the police officers witnessed that happen, the police officers would potentially have a reasonable suspicion that Plaintiff was intent upon retaliating.[50]

67.     Plaintiff's expert stated that the purpose of the Taser is to stop someone from resisting, and he was familiar with Plaintiff's testimony that he was given the police command to stop resisting between the two Taserings.

68.     Plaintiff's expert acknowledged that, if there was no more resistence in an individual after being Tasered (as Jason Blot testified happened to Plaintiff), that would be a successful application of force by the use of a Taser.

69.     Plaintiff's expert acknowledged the possibility that the police purpose for the first deployment of the Taser was to prevent or stop an altercation between Plaintiff and his father or

---

[48]     (Dkt. No. 98, Attach. 18, at 116 [attaching page "115" of Stiehm Depo. Tr.].)

[49]     (Dkt. No. 98, Attach. 18, at 119-20 [attaching pages "118" and "119" of Stiehm Depo. Tr.]; Dkt. No. 100, Attach. 18, at ¶ 67 [Plf.'s Rule 7.1 Response, failing to specifically controvert any factual assertion other than the omission of the word "potentially"].)

[50]     (Dkt. No. 98, Attach. 18, at 127-28 [attaching pages "126" and "127" of Stiehm Depo. Tr.].)

brother, and that the police purpose for the second deployment of the Taser was to stop Plaintiff from engaging in physical actions that would prevent the officers from getting him into handcuffs.[51]

70.     Plaintiff's expert acknowledged that there should be a legitimate police purpose for the deployment of the Taser, and that a legitimate police purpose for deploying Taser darts could be to break up a potential physical altercation between combatants.

71.     According to Plaintiff's expert, assuming that Plaintiff was combative and thrashing about when the officers were trying to get a hold of him and handcuff him, a second deployment of the Taser "could [have been] inappropriate but it could also [have been] reasonable," depending on whether Plaintiff was thrashing around because of pain from neuromuscular incapacitation (as part of the Tasering) and joint manipulation (as part of the attempted handcuffing).[52]

72.     Pepper spray, batons and conducted energy weapons (such as Tasers) are all considered intermediate force options.

73.     According to Plaintiff expert, the host of police uses of force that would have been appropriate in this case included the following: three officers tactically approaching Plaintiff; officers deploying the baton; and officers deploying pepper spray at certain points throughout the contact.[53]

---

[51]     (Dkt. No. 98, Attach. 18, at 141-42 [attaching pages "140" and "141" of Stiehm Depo. Tr.].)

[52]     (Dkt. No. 98, Attach. 18, at 143-44 [attaching pages "142" and "143" of Stiehm Depo. Tr.].)

[53]     (Dkt. No. 98, Attach. 18, at 163 [attaching page "162" of Stiehm Depo. Tr.].)

74.     Plaintiff's expert found no evidence of any kind of bad faith, maliciousness or punitiveness by the officers in the deployment of the Tasers, although he did not look for such evidence (believing the issue to be outside the scope of his assignment).[54]

75.     After being asked questions by defense counsel and providing answers to those questions (including those answers stated above), Plaintiff's expert told defense counsel that he not believe he had any other opinions regarding the matter that he and defense counsel had not yet talked about.[55]

**C.     Parties' Arguments**

**1.     Defendants' Memorandum of Law**

Generally, in their memorandum of law, Defendants assert twelve arguments.  (Dkt. No. 98, Attach. 23 [Defs.' Memo. of Law].)

First, Defendants argue, to the extent Plaintiff's Amended Complaint asserts claims against the Town of Colonie Police Department and the Town of Colonie, the claims against the former must be dismissed as duplicative of the claims against the latter, and the same is true of claims against the individual Town of Colonie Police Department employees sued in their official capacities.  (*Id.*)

Second, Defendants argue, Plaintiff's claims against "unknown supervisory officers" and "unknown police officers" should be dismissed for failure to prosecute under Fed. R. Civ. P. 41(b) because (a) despite knowing of the identity of two of those individuals (Officers Maclasco and Cronin) Plaintiff has inexcusably failed to seek leave to file a Second Amended Complaint identifying those individuals, (b) the deadline for such motions to amend has expired, (c)

---

[54]     (Dkt. No. 98, Attach. 18, at 144 [attaching page "143" of Stiehm Depo. Tr.].)

[55]     (Dkt. No. 98, Attach. 18, at 152 [attaching page "151" of Stiehm Depo. Tr.].)

permitting such an amendment now would unfairly prejudice Defendants because the deadline for discovery has also expired, and (d) in any event, any claims of excessive force against Officer Cronin are without basis because it is undisputed that he never applied a Taser during the incident. (*Id*.)

Third, Defendants argue, Plaintiff's first claim (of false arrest under the Fourth Amendment) must be dismissed because (a) Colonie Police Officers detained Plaintiff for only 12 minutes, and (b) in any event, they were privileged to do so pursuant to N.Y. Mental Hygiene Law § 9.41 (permitting custody of persons appearing to be mentally ill and likely of harm to himself or others), N.Y. Penal Law § 240.20 (prohibiting disorderly conduct), and/or the statute prohibiting harassment (presumably N.Y. Penal Law § 240.26). (*Id*.)

Fourth, Defendants argue, Plaintiff's second claim (of malicious prosecution under the Fourth and Fourteenth Amendments) must be dismissed because (a) he has failed to allege facts plausibly suggesting the elements of this claim, (b) in any event, he has failed to adduce admissible evidence establishing the elements of this claim (particularly the element requiring that the defendant initiated a criminal proceeding against the plaintiff), and (c) in any event, the existence of probable cause is a complete defense to such a claim. (*Id*.)

Fifth, Defendants argue, Plaintiff's third claim (of conspiracy under 42 U.S.C. § 1983) must be dismissed because (a) he has failed to allege facts plausibly suggesting the elements of this claim, and (b) in any event, based on Plaintiff's own factual allegations, this claim fails because of the intracorporate conspiracy doctrine. (*Id*.)

Sixth, Defendants argue, Plaintiff's fourth claim (of supervisory liability against Defendants Guillenese and Heider under 42 U.S.C. § 1983) must be dismissed because (a) Plaintiff's Amended Complaint fails to allege facts plausibly suggesting the personal

involvement of Defendants Guillenese and Heider in the constitutional violations alleged, and (b) in any event, he has failed to adduce admissible evidence establishing such personal involvement.  (*Id*.)

Seventh, Defendants argue, Plaintiff's fifth claim (of municipal liability for unconstitutional customs, policies and practices under 42 U.S.C. § 1983) must be dismissed because he has failed to allege facts plausibly suggesting, and/or adduce admissible evidence establishing, any inappropriate municipal policies or procedures that caused the officers' alleged misconduct, or that Defendant Town of Colonie had prior notice but repeatedly failed to meaningfully investigate charges of such misconduct.  (*Id*.)

Eighth, Defendants argue, Plaintiff's sixth claim (of municipal liability for failure to train and supervise under 42 U.S.C. § 1983) must be dismissed because he has failed to adduce admissible evidence establishing any inappropriate training (particularly of Taser training), and indeed Plaintiff's own expert has found no such inappropriate training.  (*Id*.)

Ninth, Defendants argue, in any event, based on the current record, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity (with regard to Plaintiff's claim of excessive force) because it is undisputed that officers of reasonable competence could disagree on the legality of Defendants' actions (especially given the testimony of Plaintiff's expert, who failed to give objective reasons for his conclusion that the force used was unreasonable).  (*Id*.)

Tenth, Defendants argue, Plaintiff's seventh through ninth and eleventh through twentieth claims (of violations of state law) must be dismissed because he has failed to allege facts plausibly suggesting, and/or adduce admissible evidence establishing, the elements of those claims.  (*Id*.)

Eleventh, Defendants argue, Plaintiff's tenth claim (of violation of the Americans with Disabilities Act) must be dismissed because he has failed to allege facts plausibly suggesting, and/or adduce admissible evidence establishing, that he had a disability, Defendants were aware of that disability, or that (because of the disability) he was discriminated against in employment, access to public services, or public accommodations. (*Id.*)

Twelfth, Defendants argue, Plaintiff's request for punitive damages must be denied because (a) punitive damages are not available against municipalities, and (b) in any event, there is no admissible record evidence of bad faith, maliciousness or punitiveness by the officers in the application of the Tasers. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff responds to each of Defendants' twelve arguments. (Dkt. No. 100, Attach. 17 [Plf.'s Opp'n Memo. of Law].)

In response to Defendants' first argument (regarding the duplicative nature of some of Plaintiff's claims), Plaintiff states that he "will not respond" to that argument. (*Id.*)

In response to Defendants' second argument (regarding Plaintiff's claims against unknown Defendants), Plaintiff states that he "will not respond[]" to that argument. (*Id.*)

In response to Defendants' third argument (regarding Plaintiff's federal claim of false arrest), Plaintiff argues that the record contains admissible evidence from which a rational fact-finder could conclude that (a) the officers intended to confine Plaintiff (both at the scene and at Ellis Hospital), (b) Plaintiff was conscious of the confinement, (c) Plaintiff did not consent to the confinement, and (d) even under the doctrine of qualified immunity, the confinement was not otherwise privileged under N.Y. Mental Hygiene Law § 9.41 (because grounds did not exist to take Plaintiff into custody under the statute), or under the statutes prohibiting either harassment

or disorderly conduct (because uncharged conduct cannot make an arrest otherwise privileged). (*Id.*)

In response to Defendants' fourth argument (regarding Plaintiff's federal claim of malicious prosecution), Plaintiff states that he "will not respond" to that argument. (*Id.*)

In response to Defendants' fifth argument (regarding Plaintiff's federal claim of conspiracy), Plaintiff states that he "will not respond" to that argument. (*Id.*)

In response to Defendants' sixth argument (regarding Plaintiff's supervisory liability claim), Plaintiff argues that the record contains admissible evidence from which a rational fact-finder could conclude that Defendants Gullinese and Heider were personally involved in the constitutional violations alleged because (a) they failed to remedy the wrong after being informed of the violation through a report or appeal, and (b) they created a Taser policy or custom under which the unconstitutional practices occurred (as evidenced by, *inter alia*, the fact that a subject died as a result of being Tasered by Colonie Police in 2011). (*Id.*)

In response to Defendants' seventh argument (regarding Plaintiff's municipal liability claim arising from a custom or policy), Plaintiff argues the record contains admissible evidence from which a rational fact-finder could conclude that (a) there existed inappropriate municipal policies or procedures that caused the officers' alleged misconduct, and/or (b) Defendant Town of Colonie had prior notice but repeatedly failed to meaningfully investigate charges of such misconduct (as evidenced by, *inter alia*, the fact that Officer Tremblay received a Counseling Memorandum in 2010 for not appearing to take training "seriously" through wearing shorts or jeans, eating during class, and having his feet up). (*Id.*)

In response to Defendants' eighth argument (regarding Plaintiff's municipal liability claim arising from a failure to train and supervise), Plaintiff argues that the record contains

admissible evidence from which a rational fact-finder could conclude that there was inappropriate Taser training (especially considering the 2011 Taser fatality). (*Id*.)

In response to Defendants' ninth argument (regarding the doctrine of qualified immunity), Plaintiff argues that, based on the current record, undisputed that officers of reasonable competence could disagree on the legality of Defendants' actions, because (a) the issue does not turn on the testimony of Plaintiff's expert opinion but the conclusion of a rational fact-finder, (b) it is undisputed that Plaintiff had been pushed down by his father, and (c) here, an abundance of admissible evidence exists that, *inter alia*, Plaintiff did not pose a threat before his first Tasering, and was not actively resisting before his second Tasering. (*Id*.)

In response to Defendants' tenth argument (regarding Plaintiff's state law claims), Plaintiff argues that he has adduced admissible evidence establishing the elements of his state law claims. (*Id*.)

In response to Defendants' eleventh argument (regarding Plaintiffs' claim under the Americans with Disabilities Act), Plaintiff states that he "will not respond" to that argument. (*Id*.)

In response to Defendants' twelfth argument (regarding punitive damages), Plaintiff argues, while a municipality is not liable for punitive damages in a Section 1983 action, Defendants in their individual capacities may be so liable where, as here, their conduct involved reckless or callous indifference to Plaintiff's federally protected rights. (*Id*.)

### 3. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants assert seven arguments. (Dkt. No. 104 [Defs.' Reply Memo. of Law].)

First, Defendants argue, Plaintiff has failed to adduce admissible record evidence from which a rational jury could find in his favor on any of his claims.  (*Id.*)

Second, Defendants argue, based on the current record, officers of reasonable competence could disagree as to whether the Defendant officers were privileged to arrest Plaintiff under N.Y. Mental Hygiene Law § 9.41.  (*Id.*)

Third, Defendants argue, Plaintiff has failed to adduce admissible evidence establishing such personal involvement of Defendants Guillinese or Heider in the constitutional violations alleged (especially given the evidence that the 2011 death was not "Taser related").  (*Id.*)

Fourth, Defendants argue, another reason that Defendants Guillinese and Heider were not personally involved in the constitutional violations alleged is that, by the time they learned of the wrong, Plaintiff had already been Tasered.  (*Id.*)

Fifth, Defendants argue, Plaintiff has failed to adduce admissible evidence establishing his claim for negligent training under federal or state law.  (*Id.*)

Sixth, Defendants argue, based on the current record, Defendants are protected from liability by the doctrine of qualified immunity with regard to Plaintiff's state law claims of dissatisfaction with police conduct.  (*Id.*)

Seventh, Defendants argue, Plaintiff has failed to adduce admissible evidence establishing his claims for intentional and negligent infliction of emotional distress.  (*Id.*)

## II.     GOVERNING LEGAL STANDARDS

### A.     Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record]

evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[56]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[57]  Of course, when a non-movant fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must

---

[56]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[57]    *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has failed to properly respond to that statement,[58]

Similarly, in this District, where a non-movant has failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[59] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . .");

---

[58]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[59]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

*Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B.  Motions to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Fed. R. Civ. P. 56 is based on the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). In such a case, "a trial judge may dismiss for failure to state a cause of action . . . ." *Schwartz v. Compagnise General Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968); *accord, Katz v. Molic*, 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

Here, portions of Defendants' motion for summary judgment are based on the factual allegations contained in Plaintiff's Amended Complaint. *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order.  For these reasons, it is appropriate to summarize the legal standard governing motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim.  *Jackson v. Onondaga Cnty.*, 549 F. Supp.2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp.2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp.2d at 212, n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp.2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp.2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp.2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id*. at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id*. at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id*.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S.Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id*., it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed. R. Civ. P. 8, 10 and 12.[60] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed. R. Civ. P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[61] Stated more simply, when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended." *Jackson*, 549 F. Supp.2d at 214, n.28

---

[60] *See Vega v. Artus,* 610 F. Supp.2d 185, 196 & nn.8-9 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F. Supp.2d at 214 & n.34 (citing Second Circuit cases).

[61] *See Rosendale v. Brusie*, 374 F. App'x 195, 196 (2d Cir. 2010) ("[A]lthough the courts remain obligated to construe a pro se complaint liberally, . . . the complaint must contain sufficient factual allegations to meet the plausibility standard."); *Vega,* 610 F. Supp.2d at 196, n.10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F. Supp.2d at 214 & n.34 (citing Second Circuit cases).

[citations omitted].[62]  Furthermore, the Court notes that, here, Plaintiff's Amended Complaint

(which is virtually identical to his original Complaint) was drafted by an attorney.  (*Compare*

Dkt. No. 1 *with* Dkt. No. 13.)

## C.  Legal Standards Governing Plaintiff's Claims

Because the parties to this action have demonstrated, in their memoranda of law, an

accurate understanding of the relevant points of law contained in the legal standards governing

Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in

this Decision and Order, which (again) is intended primarily for review by the parties.  (Dkt. No.

98, Attach. 23 [Defs.' Memo. of Law]; Dkt. No. 100, Attach. 17 [Plf.'s Opp'n Memo. of Law];

Dkt. No. 104 [Defs.' Reply Memo. of Law].)

## III.  ANALYSIS

After carefully considering the matter, the Court dismisses all of Plaintiff's claims,

except his claim of excessive force under the Fourth Amendment against Defendants Calabrese

and Tremblay.  The reasons for the dismissals are those stated by Defendants in their memoranda

of law.  *See, supra,* Parts I.C.1. and 1.C.3. of this Decision and Order.  The reasons for the non-

---

[62]        It should be emphasized that Fed. R. Civ. P. 8's plausibility standard, explained in
*Twombly*, was in no way retracted or diminished by the Supreme Court's decision (two weeks
later) in *Erickson v. Pardus*, in which (when reviewing a *pro se* pleading) the Court stated,
"*Specific* facts are not necessary" to successfully state a claim under Fed. R. Civ. P. 8(a)(2).
*Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) [emphasis added].  That statement was merely
an abbreviation of the often-repeated point of law–first offered in *Conley* and repeated in
*Twombly*–that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in
order to successfully state a claim.  *Twombly*, 127 S. Ct. 1965, n.3 (citing *Conley*, 355 U.S. at 47)
[emphasis added].  That statement did not mean that all pleadings may achieve the requirement
of "fair notice" without ever alleging any facts whatsoever.  Clearly, there must still be enough
fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to
relief above the speculative level to a plausible level.  *See Rusyniak,* 629 F. Supp.2d at 214 &
n.35 (explaining holding in *Erickson*).

dismissal are those stated by Plaintiff in his opposition memorandum of law.  *See, supra,* Part I.C.2. of this Decision and Order.  To those reasons, the Court adds ten points (which are meant to supplement and not supplant the aforementioned reasons).

First, in his opposition memorandum of law, Plaintiff expressly fails to respond to Defendants' first, second, fourth, fifth, and eleventh arguments.  *See, supra,* Part I.C.2. of this Decision and Order.  In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).[63]  Here, the Court finds that Defendants' first, second, fourth, fifth, and eleventh arguments possess, at the very least, facial merit.  *See, supra,* Part I.C.2. of this Decision and Order.  The Court reaches the same conclusion

_____

[63]  Alternatively, the court can deem the challenged claim abandoned (regardless of the facial merit of the unresponded-to argument).  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made–i.e., referencing some claims or defenses but not others–a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

with regard to those portions of Defendants' fourth, fifth, sixth, seventh, tenth and eleventh arguments asserting a failure-to-state-a-claim argument,[64] to which Plaintiff never responded (except with regard to Plaintiff's excessive force claim, which the Court finds to have been adequately pled in the Amended Complaint).

Second, regarding Plaintiff's first claim (of false arrest under the Fourth Amendment), the Court finds that, even if qualified immunity does not protect Defendants Tremblay and Calabrese for taking Plaintiff into custody pursuant to N.Y. Mental Hygiene Law § 9.41, probable cause existed to arrest him for disorderly conduct in violation of N.Y. Penal Law § 240.20, and/or harassment in the second degree in violation of N.Y. Penal Law § 240.20.

As a threshold matter, the Court notes that, in opposing this alternative argument asserted by Defendants, Plaintiff argues only that Defendants cannot rely on the offenses of disorderly conduct and harassment because Plaintiff was never charged with those offenses. (Dkt. No. 100, Attach. 17, at 15 [attaching page "10" of Plf.'s Opp'n Memo. of Law].)[65] Plaintiff is mistaken that conduct need actually be charged to make an arrest "otherwise privileged." *See Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). ("[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant[;] . . . it is not relevant whether probable cause existed with respect to . . . any charge actually invoked by the arresting officer at the time of

---

[64]     *See, supra,* Part II.B. of this Decision and Order.

[65]     The Court notes that, while Plaintiff mentions the charge of disorderly conduct again in responding to Defendants' ninth argument (which applies the doctrine of qualified immunity to Plaintiff's claim of excessive force), he does so only to the extent that he argues that Defendants are not protected by the doctrine of qualified immunity (with regard to Plaintiff's claim of excessive force) because disorderly conduct is only a violation. (Dkt. No. 100, Attach. 17, at 25 [attaching page "20" of Plf.'s Opp'n Memo. of Law].)

arrest.").[66]

Turning to the merits of a charge of disorderly conduct, the elements of such a charge are

as follows: (1) the defendant's conduct must be public in nature; (2) it must be done with intent

to cause public inconvenience, annoyance or alarm or with recklessness as to a risk thereof; and

(3) it must match at least one of the descriptions set forth in the statute. *Provost v. City of

Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001). Among the descriptions of conduct set forth in the

statute are the following: (1) engaging in "threatening behavior"; (2) making "unreasonable

noise"; or (3) in a public place, using "abusive or obscene language." N.Y. Penal Law §

240.20(1)-(3). Here, the following facts are undisputed: (1) while outside his father's house,

Plaintiff raised his voice and yelled at both his brother and his father; (2) Plaintiff took a flag off

the wall of his father's house and threw it on the ground of the front yard; and (3) Plaintiff

yelled, "Fuck you, Dad," at his father. *See, supra,* Fact Numbers 9, 12, 13, and 17 in Part I.B. of

this Decision and Order.[67] As a result, the Court finds that, under the circumstances, it is

undisputed that Defendants Tremblay and Calabrese had probable cause to arrest Plaintiff for

---

[66]     *See also Noel v. Cty. of Nassau,* 11-CV-5370, 2015 WL 541461, at * 6 (E.D.N.Y.
Feb. 7, 2015) ("[I]f Officer Cardone had probable cause to arrest Plaintiff on any of the charges
filed against Plaintiff (or any uncharged offense as well), the arrest is entirely privileged . . . .");
*Ruttkamp v. De Los Reyes*, 10-CV-0392, 2012 WL 3596064, at *8 (D. Conn. Aug. 20, 2012)
("The Second Circuit has made clear that . . . the existence of probable cause to arrest for . . .
uncharged crimes provides a defense to claims of false arrest . . . ."); *Adonis v. Coleman*, 08-CV-
1726, 2009 WL 3030197, at *7 (S.D.N.Y. Sept. 23, 2009) ("Although Tahani was not charged
with obstructing pedestrian traffic, an arrest is not unlawful if the officer has probable cause to
believe that the person arrested has committed any crime, regardless of whether probable cause
supported any charge identified specifically by the arresting officer at the time of arrest.")

[67]     The Court notes that, in his deposition, Plaintiff acknowledged that there were
"maybe" grounds to arrest him for disorderly conduct in violation of N.Y. Penal Law § 240.20.
(Dkt. No. 98, Attach. 15, at 196-97 [attaching pages "195" and "196" of Plf.'s EBT Tr.].)

disorderly conduct in violation of N.Y. Penal Law § 240.20.[68]  At the very least, officers of

reasonable competence could disagree on the issue.[69]

Third, regarding Plaintiff's fourth claim (of supervisory liability against Defendants

Guillenese and Heider under 42 U.S.C. § 1983), the Court notes that, to the extent that Plaintiff

hinges their alleged personal involvement on their failing to "remedy" the alleged violations of

September 13, 2013 (after learning of them through a report of appeal), the Court rejects that

theory of liability on the alternative ground that, by the time Defendants learned of the

violations, the violations had ended and could not be stopped by Defendants.[70]  Moreover, to the

extent that Plaintiff hinges these two Defendants' personal involvement on the creation of a

_____

[68]       The Court notes that the fact that, under New York State law, a police officer can only issue an appearance ticket for a particular offense is inapplicable to the probable-cause-for-arrest analysis under the Fourth Amendment.  *See Auricchio v. Town of DeWitt*, 10-CV-1072, 2013 WL 868261, at *15 & n.89 (N.D.N.Y. March 7, 2013) (Suddaby, J.) ("Even if Defendants were able under the noise ordinance to only issue Plaintiff an appearance ticket (rather than arrest him), that fact would not give rise to a Fourth Amendment claim under 42 U .S.C. § 1983.") (collecting cases), *aff'd*, 552 F. App'x 95 (2d Cir. 2014).

[69]       The Court notes that it does *not* find to be undisputed that Defendants Tremblay and Calabrese had probable cause to arrest Plaintiff for harassment in the second degree in violation of N.Y. Penal Law § 240.26 because (1) it is undisputed that his bumping of his father was accidental and (2) there is a genuine dispute regarding whether Plaintiff was attempting to get up and move toward his father or whether he was simply lying down, after he was pushed down by his father (and before he was first Tasered).  *See, supra,* Fact Numbers 17, 18, 22, 29 & n.17 in Part I.B. of this Decision and Order.

[70]       *See Jordon v. Fischer*, 733 F. Supp.2d 255, 278 (N.D.N.Y. 2011) (Report-Recommendation of Baxter, M.J., adopted by Sharpe, J.) ("In the case of an alleged assault, finding out about the assault after the fact does not render DSS Racette liable for the constitutional violation."); *Rahman v. Fisher*, 607 F. Supp.2d 580, 585 (S.D.N.Y. 2009) ("[A] supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it."); *Harnett v. Barr*, 538 F. Supp.2d 511, 524 (N.D.N.Y. 2008) (Hurd, J.) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to "remedy" a violation.").

Taser policy or custom under which the unconstitutional practice at issue in this action occurred, based on the admissible record evidence before the Court, the Court finds that the 2011 incident upon which they rely was not sufficiently related to the incident at issue in this action (nor was it sufficiently numerous) to evidence such a policy or custom. (Dkt. No. 100, Attach. 3, at 80-81, 88-89 [attaching pages "80," "81," "88," and "89" of Heider's Depo. Tr.]; Dkt. No. 104, Attach. 1, at 3 [attaching page "23" of Heider's EBT Tr.].)[71] The Court notes that it would reach the same conclusion even if it were to rely on the hearsay newspaper article adduced by Plaintiff. (Dkt. No. 100, Attach. 7 [Newspaper Article of 2011 Incident].) *See Odom v. Matteo*, 772 F. Supp.2d 377, 403-04 (D. Conn. 2011) (finding newspaper article of prior incident to be inadmissible hearsay).

Fourth, regarding Plaintiff's ninth claim (of negligent infliction of personal injuries pursuant to "state and federal law"), the Court dismisses this claim on the alternative ground that there is no federal cause of action for negligent infliction of personal injuries. *See Ateek v. Mass.*, 11-CV-11566, 2011 WL 4529393, at *2 (D. Mass. Sept. 27, 2011) ("I cannot find that Ateek's claim of negligent infliction of personal injuries state a basis for invocation of the subject matter jurisdiction of this Court under its federal question jurisdiction.").

Fifth, regarding Plaintiff's tenth claim (of a claim of violation of his rights under the "state and federal" Americans with Disabilities Act), the Court notes that, because the Americans with Disabilities Act is a federal statute, there is no state-law claim for a violation of

---

[71]    The Court notes that it considers page 23 of Defendant Heider's examination-before-trial transcript (submitted for the first time in Defendants' reply), for the following two reasons: (1) Plaintiff raised the issue of Heider's sworn testimony in his opposition (by adducing Heider's deposition transcript); and (2) in his letter-motion of October 19, 2016, Plaintiff does not take issue with the accuracy or context of the proffered page of examination-before-trial testimony or show undue prejudice from the Court's consideration of that page. (Dkt. No. 106.)

that statute. As a result, the Court dismisses this portion of Plaintiff's tenth claim on this alternative ground.

Sixth, Plaintiff's eighth and fourteenth claims (of negligent infliction of emotional distress and intentional infliction of emotional distress) are dismissed on the alternative ground that, to the extent that the claim are premised on the same conduct giving rise to his federal excessive force claim, they are duplicative of that federal excessive force claim. *See Jones v. Parmley,* 98-CV-0374, 2016 WL 5793711, at *1 (N.D.N.Y. Oct. 4, 2016) (Scullin, J.) ("[Plaintiffs'] claims for intentional infliction of emotional distress and negligent infliction of emotional distress . . . [are] dismisse[d] . . . as duplicative of their . . . excessive force, [and] assault and battery . . . claims."); *Caravalho v. City of New York*, 13-CV-4174, 2016 WL 1274575, at *23 (S.D.N.Y. Mar. 31, 2016) (dismissing as duplicative negligent infliction of emotional distress claim because "the conduct at issue–[the defendant's] allegedly unreasonable use of force–and any resulting emotional damage is entirely subsumed by [the plaintiff's] common law assault and battery claim and his federal excessive force claim").

Seventh, regarding Plaintiff's fifteenth and sixteenth claims (of assault and battery under state law), those claims are dismissed on the alternative ground that they are redundant of his federal excessive force claim. Granted, generally, "[u]nder New York state law, assault and battery claims are more plaintiff friendly [than is a federal excessive force claim], because under New York law if an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest." *Graham v. City of New York*, 928 F. Supp.2d 610, 624 (E.D.N.Y. March 6, 2013) (internal quotation marks and citations omitted). However, here, as stated above

in its second point, the Court has found that the arrest was lawful as a matter of law. As a result (with the exception of the "color of state law" element of his federal excessive force claim), the elements of Plaintiff's federal excessive force claim are substantially identical to those of his state-law assault and battery claims. *See Posr v. Doherty,* 944 F.2d 91, 94-95 (2d Cir.1991) ("[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical."); *Pelayo v. Port Authority*, 893 F.Supp.2d 632, 642 (S.D.N.Y. 2012) ("Similar to a claim for excessive force under § 1983, a state law claim for battery against a police officer in the course of an arrest requires the plaintiff to prove that the officer's use of force was excessive or objectively unreasonable under the circumstances.") (internal quotation marks omitted); *Raymond v. Bunch*, 136 F. Supp.2d 71, 81 (N.D.N.Y. 2001) (Hurd, J.) ("[Plaintiff's] cause of action [for assault] must be dismissed, as it is duplicative of [Plaintiff's] third cause of action for excessive force.") [citations omitted].

Eighth, regarding Plaintiff's nineteenth claim (of "constitutional violations"), the Court dismisses this claim on the alternative ground that it is impermissibly vague and/or redundant of his first, second and eleventh claims (which assert claims for violations of the Fourth and Fourteenth Amendments). *See, e.g., Anderson v. City of New York*, 13-CV-1745, 2013 WL 6182675, at *2, n.4 (S.D.N.Y. Nov. 19, 2013) ("The Court finds plaintiff's first cause of action, which seeks relief against all defendants for various constitutional violations under 42 U.S.C. § 1983, to be duplicative of plaintiff's other § 1983 claims."); *Keller v. Sobolewski*, 10-CV-5198, 2012 WL 2863228, at *1 (E.D.N.Y. Oct. 12, 2012) (dismissing plaintiff's first count, alleging a general deprivation of federal civil rights, as duplicative of subsequent counts, alleging specific violations of the Fourth and Fourteenth Amendment).

Ninth, regarding Plaintiff's twentieth claim (of "violation of police procedures regarding stun guns"), the Court dismisses this claim on the alternative ground that it is impermissibly vague and/or redundant of his other claims.

Finally, regarding Plaintiff's eleventh claim (of excessive force under federal law), in viewing the current record in favor of Plaintiff, a rational fact-finder could conclude as follows: (1) any communications by the 911 dispatcher to Defendants Tremblay and Calabrese before they arrived at 36 Hampshire Road (e.g., indicating that Plaintiff was violent) were at least somewhat undermined by facts they observed there (e.g., Plaintiff not being dressed for battle but in only a towel, his apologizing for accidentally bumping into his father, his being able to be pushed and held down, etc.); (2) after Plaintiff was pushed down by his father and released by his brother he was simply trying to get up when he was Tasered a first time; (3) before Plaintiff was Tasered a second time, he was involuntarily writhing on the ground due to the Tasering (and begging the officers not to Taser him again) rather than actively resisting arrest;[72] (4) the subsequent force used to handcuff Plaintiff (including but not limited to the tightness of the handcuffs) was not necessary; (5) the subsequent "fight[ing]" reportedly observed by EMS personnel was (at most) merely verbal, not physical, in nature;[73] and (6) some or all of any

_____

[72]    (*See, e.g.,* Dkt. No. 98, Attach. 15, at 161-63 [attaching pages "160" through "162" of Plf.'s EBT Tr., testifying that he was neither moving nor resisting before he was Tasered a second time, but that he begged them, "Please, stop it"].)

[73]    (*See, e.g.,* Dkt. No. 98, Attach. 15, at 164-68 [attaching pages "163" through "167" of Plf.'s EBT Tr., testifying that EMS personnel were not yet present when he was subdued, that he never fought with either police or EMS personnel, and that by "fight" EMS personnel must have meant being verbally abusive, because he said to them, "Fuck you"]; Dkt. No. 98, Attach. 16, at 82 [attaching page "81" of Berry Blot's Depo. Tr., disagreeing with the EMS report that Plaintiff was combative or continued to fight with the police officers]; Dkt. No. 98, Attach. 17, at 75-76 [attaching pages "72" and "73" of Jason Blot's Depo. Tr., disagreeing with the EMS report that Plaintiff continued to fight with the police or the EMS personnel, and testifying that, after Plaintiff was Tasered a second time, he was "done" and "there was no fight left in the kid"])

mental health issues addressed during Plaintiff's hospitalization were caused by the amount of force used by Defendants Tremblay and Calabrese rather than by a pre-existing mental health condition.  Under the circumstances, the Court has difficulty finding that, when presented with such facts, reasonable officers could disagree on the legality of Defendants Tremblay and Calabrese's use of force to arrest Plaintiff.  Simply stated, rational jury may well rule in their favor; but it also might not.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 98) is **GRANTED in part** and **DENIED in part**, and all of Plaintiff's claims are **DISMISSED** except for his excessive force claim under the Fourth Amendment against Defendants Tremblay and Calabrese, which remains **PENDING** in this action; and it is further

**ORDERED** that counsel are directed to appear on **FEBRUARY 17, 2017**  at 11:00 a.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than JANUARY 26, 2017, and the parties are directed to engage in meaningful settlement negotiations prior to the conference.  In the event that counsel feel settlement is unlikely, counsel may request to participate via telephone conference for the limited purpose of scheduling a trial date by electronically filing a letter request at least one week prior to the scheduled conference.

Dated: January 5, 2017
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge